# THE GYPSUM KING.

(Circuit Court of Appeals, Second Circuit. February 28, 1910.)

## No. 137.

TOWAGE (§ 11*)—LOSS OF TOW—STRESS OF WEATHER—NEGLIGENCE OF TUG.

An ocean tug proceeding with two barges laden with coal from Lambert's Point, Va., to Pawtucket, R. I., *held* not liable for the loss of one of the barges which was swamped during the night in a northeast snow-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

storm between Winter Quarter Shoal and Fenwick Island Lightship in the Atlantic, because the master did not turn back in the afternoon, when the wind had attained a velocity of 25 to 30 miles an hour, and seek a harbor in Assateague, which was at that time 25 miles or more to the south of her; the evidence showing that the storm was not unusually heavy, and was safely ridden by the other barge, and might have been by the one that was lost but for an injury to her engine house from a heavy sea, which caused her to fill.

[Ed. Note.—For other cases, see Towage, Dec. Dig. § 11.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by James Hughes and Peter Shoop, as owners of the barge Jenna Hughes, against the steam tug Gypsum King. Decree for libelants, and claimant appeals. Reversed.

See, also, 172 Fed. 1022, 96 C. C. A. 665.

Wing, Putnam & Burlingham (Charles C. Burlingham, of counsel), for appellant.

James J. Macklin (De Lagnel Berier, of counsel), for appellees.

Before LACOMBE and WARD, Circuit Judges, and ADAMS, District Judge.

LACOMBE, Circuit Judge. The barge was taken in tow by the Gypsum King, a steel ocean-going tug, 165 feet long, drawing 17 feet of water, at Lambert's Point, Va., to be towed to Pawtucket, R. I. She was on a hawser of 200 fathoms; another smaller barge, the Camden, being tailed onto her by a hawser of about 150 fathoms. The Hughes was about 320 feet long. She was converted from an old side-wheel steamboat, carried 2,000 tons of coal, and drew between 15 and 16 feet. Her freeboard was between 3 and 5 feet. They started from Lambert's Point about 1 p. m., January 23, 1903. The libel charged fault in leaving harbor when there were indications of bad weather approaching; but the evidence does not sustain such charge, and the District Court so held. The weather was clear when they passed Hampton Roads, and when they reached Cape Henry about 5 p. m. the wind had shifted from southwest to the northward, light, and the sea moderate. Thus far all agree. The respective narratives of future transactions are as follows: Shoop, the master of the Hughes, says that they came to Hog Island about midnight, that it was then pretty rough and so much breeze, northeast, that they took some water over the bows. He "guesses" the tug slowed down about that time. That they passed Winter Quarter Lightship between 11 a. m. and 12 m. That lightship is about 10 miles offshore and nearly the same distance beyond the entrance to Assateague anchorage. Shoop says that he was on deck in the wheelhouse all the time after passing Hog Island. That in the morning, about 8 a. m., when, as he figured, he was about off Assateague, it was blowing a strong breeze, and the Hughes was taking so much water over the bow that one had hard work to get forward to the engine room, which was located 25 or 30 feet from the stern. That in the afternoon after dinner it started to get more clouded over, and about 3 or 4 o'clock it started snowing

hard, the seas were getting rough, and they were taking water in over the bow; the wind being northeast. After the snow began it "kept on snowing, blowing, and squalls-like, once in a while you couldn't see anything; had hard work to see tug's lights once in a while on account of the snowing." Lights were lit at 5 p. m. All that day the men going forward had to be careful so as not to be washed overboard. Her rail was about two feet high. As long as they were head to the wind they could get forward any time mostly; that is to say, if they were very careful. In the evening about 7 o'clock a heavy sea came over and knocked the engine house out of shape, upsetting the boiler. Part of the house went overboard. This left an uncovered opening in the deck through which succeeding seas made their way, and she started filling. Deprived of the pumping arrangements in the engine house, they were not able to keep the water under control, and by 8 or a quarter to 8 there was four feet of water in the barge. The master soaked a broom in kerosene and lighted it, thus attracting the attention of the tug, which came back about 8:30 p. m., and rescued the master and crew of the barge, which subsequently sank. The hawsers were cut and the Camden anchored. The tug lay around there the whole night and about 11 a. m. of the 25th, the storm being still on, took the Camden in tow and brought her to Delaware Breakwater. This witness says that at the time the hawsers were cut a heavy sea was breaking over the barge all the time, and "it was blowing a gale, what I call a gale of wind—big snowstorm." On cross-examination he admitted that he had often been out in storms worse than this and had ridden them out held by tugs up against wind and sea; also, that if the accident had not happened to the engine house it might be they would have come through all right; that his boat was as good as the Camden. He said that he felt anxious about his boat because "it was such a fierce gale."

The master of the tug, a man of 20 years' experience as master, testified that they passed Cape Henry about 5 p. m. (23d) with wind light to the northwest; that about 2 a. m. (24th) the wind canted around a little more easterly when a little to the northward of Hog Island, sea moderately smooth, and no indication of bad weather. They kept going along and up to Winter Quarter along in the forenoon possibly 8 or 9 in the morning, the log gives it 9:45 a. m. He said there was a good strong northeast breeze there, and the wind was canting more easterly. The conditions and looks of the vessels were so that he thought they were able to stand anything that he could tow them against, and he kept along. He thought he would have to make a shelter in the breakwater. He further testified that it commenced to snow about 4 p. m., and then it commenced to get up a little sea, and, seeing there was no chance to get to a harbor, he hove to, head to the sea, just letting the boat turn over and hold there. Between 7 and 8 p. m. he saw the light on the barge, turned back, and rescued master and crew. The Camden anchored. The tug lay around in the vicinity and watched the barge, losing sight of her about 3 a. m. in thick snow. When daylight came he searched for her unsuccessfully throughout the forenoon and then hooked onto the

Camden and started ahead. After a while it commenced to storm and to get up a sea, and the Camden steered badly, so he went into Delaware Breakwater. He estimated the wind, at the time the Hughes signaled to him at 20 to 25 miles an hour. On cross-examination he testified that there was a fresh northeast breeze at midnight; that he did not feel the sea until he got up to Winter Quarter, just after passing which he eased down a little as the sea was getting higher; that between 3 and 4 p. m. he slowed down more because of the bad weather and hove to about dark; that when he passed Winter Quarter he had no thought but what he could make the breakwater with the tows; that he did not regard it as a heavy storm and estimated the maximum velocity of the wind at 25 miles.

The mate of the tug, a licensed man for eight years, who kept the log, was off watch in the forenoon. He came on at 12 m. of the 24th. He testified that at that time the wind was northeast with a fresh breeze and a head sea, but nothing to make it seem necessary to seek a shelter. At 4 p. m. when the snow set in, the sea was getting worse, and the boat's head was hauled to head sea and engines slowed down. When he came off watch at 6 p. m., she was lying to. He estimated the maximum wind velocity at 25 miles.

Tapley, master of the steamship Princess Anne, left Norfolk at 7 p. m. of the 23d and reached New York at 2:45 p. m. of the following day, passing Chincoteague (near Assateague) at 1:38 a. m. of the 24th. The wind was northeast, light and variable till he passed Chincoteague, when it became fresh and cloudy; no sea to speak of the whole passage. Fresh wind would be anywhere from 20 to 25 miles an hour.

The weather records at Delaware Breakwater show for the forenoon of the 24th the wind northeast from midnight till 10 and then east till noon; velocity at midnight 27, falling gradually to 16 between 3 and 4 a. m.; then freshening up to 18 and 19 for four hours; and further increasing to 23 between 11 and noon. In the afternoon it was from 12 to 1, 27, from 1 to 2, 32, and after a slight reduction rose to 33 and 34 for the rest of the period. It continued northeast from noon till 2 o'clock, then shifted to east, and held in that quarter till nearly midnight.

The district judge held the tug in fault because the master did not turn back before 2 or 3 o'clock in the afternoon and seek a harbor in Assateague. There is much testimony in the record as to this anchorage. The United States coast pilot states that there is no sheltered anchorage available for vessels over 6 feet draft in easterly gales between Cape Charles and Delaware Breakwater, although a limited number of vessels of 12 feet or less draft can find anchorage in Assateague; and, elsewhere, that there is shelter there for large vessels in northerly and northeasterly winds, and that "the part of the anchorage affording shelter against easterly winds is good for vessels of 15 feet or less draft." It will be remembered that the tug drew 17 feet, and the barge, loaded as she was, 16 feet according to her owner's statement. Also, that the master of the tug noted a tendency of the wind to haul to the eastward, and the record at the breakwater confirms his statement. There is some testimony tending to show that

Assateague is a somewhat better anchorage than the coast pilot indicates; but we do not think it necessary to discuss it, because the master of the tug knew little, if anything, about Assateague. It was his duty to be well informed about all harbors of refuge on the route he had been traversing with tows for several years, and there must be imputed to him knowledge of the conditions at Assateague, and, for the purposes of this case, we may assume they were better than the coast pilot indicated. But such imputation and assumption is not decisive of this case.

It is quite evident from the record that they had gone a considerable distance beyond Winter Quarter before the conditions of wind and weather became serious. Indeed, the storm does not seem at any time to have been a heavy one. It was the accident to the engine house, which, by uncovering the deck, made the seas dangerous to the Hughes. The Camden with a much lower freeboard had no difficulty in riding them out at her anchor. Something more than a mere wind velocity of 25 to 30 miles would seem to be necessary in order to make it the duty of a tug with tow to turn back to seek a harbor. But assuming that even as early as 2 or 3 o'clock in the afternoon (snow did not begin till 4) the conditions were such that a prudent navigator should have sought shelter, we are not satisfied that the master of the Hughes should be held in fault because he did not then turn back to seek it at Assateague. We accept the hour given in the log, 9:15 a. m., for passing Winter Quarter, and even if, after slowing there, they only made 4 miles an hour, they were 25 miles north of Assateague entrance by 2 p. m. We cannot find that the master was reckless or imprudent in holding on for the breakwater with what were apparently seaworthy tows against a 32-mile breeze instead of turning back.

The decree is reversed, with costs, and cause remanded, with instructions to dismiss the libel, with costs.

NOTE.—The following is the opinion of Holt, District Judge, in the court below:

HOLT, District Judge. If the fact had been, as the captain of the Gypsum King supposed, that there was no safe harbor for vessels of the draft of his tug and tow between Hampton Roads and the Delaware Breakwater, I can see no ground for a claim that he was negligent. There were no indications of bad weather until the forenoon of the 24th. When it became apparent that there was a storm coming sufficiently severe to make it the duty of the master of the tug to run into a harbor, he had reached such a point that, if there had been no anchorage between the two points stated, it would have been a question of judgment for him which place to endeavor to reach. He admits that on the morning of the 24th he recognized that the storm was sufficiently severe to make it his duty to seek shelter, and that he was intending to get in to the Delaware Breakwater if possible. But it was his duty, as soon as he recognized the necessity of seeking shelter, to seek it in the nearest harbor. Assateague was near at hand, and, in my opinion, it could have been reached while it was daylight, if he had started for it before 2 or 3 o'clock that day. It is apparent, from his log and from the official weather reports, that there was every indication of a northeast gale in the morning when he passed Assateague. The wind rose from 19 to 20 miles an hour that morning to 34, a moderate gale, in the afternoon. The log shows that the sea was very high, and that the weather was certainly growing worse all that day. The tug slowed down in the morning because of the heavy sea, and slowed down again

still more in the afternoon, and finally, heading to the wind and sea, slowed down so as simply to keep the engines turning and to hold herself from drifting back, because the storm had become so severe. Under these circumstances, it seems to me entirely clear that the Gypsum King was in fault for not going into Assateague. if Assateague afforded a fairly safe shelter for the tug and tow at that time.

In my opinion. the preponderance of evidence is that it would have been a substantially safe harbor for the tug and tow in that storm. The wind was never further south than east that day. It was at first northeast, then east northeast, then east, finally going back to northeast. The statement in the Coast Pilot is not that it is an unsafe harbor when the wind was at all south of east. The statement is that it "affords shelter for large vessels in northerly and northeasterly winds. The part of the anchorage affording shelter against easterly winds is good for vessels of 15 feet or less draft. * * * If the wind shifts southward of southeast, the anchorage is exposed to the full sweep of the sea, and becomes unsafe." I understand from this that this anchorage would afford shelter against any winds east or north of east for vessels of 15 feet. The barges did not draw 15 feet. If the place did not afford secure anchorage for the Gypsum King, the barges could have been anchored there, and the tug could have gone out to sea.

This is not like the case of The Covington, where the master was called on to exercise his judgment as to which of two ports he should try to make. He admits in his evidence that he did not know that Assateague was a safe anchorage for vessels of that draft. It was not a case of exercising his judgment as between the Delaware Breakwater and Assateague. He assumed that he could not go in to Assateague, and admits that at that time he did not know that any vessels of large draft ever went in there. The decisive fact in this case, therefore, is that the captain of this tug, undertaking to tow vessels from Chesapeake Bay up the coast of Providence, did not know the existence of this harbor along the coast where in case of necessity he could take his tow. It is fully described in the Coast Pilot, and the evidence establishes that it has been well known to mariners as a port of refuge for many years. I think that such ignorance in the master is not only no excuse, but an aggravation of his fault.

My conclusion is that there should be a decree for the libelants, with the usual reference to compute the damage.